BARRY J. PORTMAN
Federal Public Defender
STEVEN G. KALAR
Assistant Federal Public Defender
450 Golden Gate Avenue
San Francisco, CA 94102
Telephone: (415) 436-7700

Counsel for Defendant Magana-Alvarado

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) No. CR 07-0379 SI |
| Plaintiff, | ) DEFENDANT'S SENTENCING MEMORANDUM |
| v. | ) |
| JORGE MAGANA-ALVARADO, | ) **Sentencing Hearing Date**: Friday, August 22, 2008 at 11:00 a.m. |
| Defendant. | ) |

Mr. Magana-Alvarado pleaded guilty extremely early in this case, raised no pretrial motions, and set no trial date. The Court should begin its analysis at the low end of the guideline range, fifteen months, and should then depart and vary downwards in light of Mr. Magana-Alvarado's lost opportunity to serve concurrent time and to avoid disparity from other more-culpable "fast-track defendants. Given these factors, the Court should impose a sentence of seven months.

**Discussion**

**I.    The Court Should Depart and Vary off of the *Low* End of the Guidelines, Fifteen Months**

When he was finally brought into federal court,[1] Mr. Magana-Alvarado rushed to a guilty plea, filed no pretrial motions, and set no trial date. There is nothing egregious or unusual about his case that warrants punishing him by imposing a mid-range or high-end guideline sentence. To the contrary, there is much in the case that merits starting the departure and Section 3553(a) analysis at the *low* end of the guideline range: fifteen months.

First, it bears emphasis that Mr. Magana-Alvarado did not challenge his (arguably) defective indictment under *Salazar-Lopez*.[2] From recent experience on another Section 1326 case, this Court is very familiar with the *Salazar-Lopez* issue and the – unique – indictments obtained by the Northern District of California United States Attorney. *See United States v. Juan Herrera-Santos*, CR 07-00764 SI (N.D. Cal. Apr. 21, 2008) (ord.). Interestingly, the Ninth Circuit has very recently granted mandamus on a number of defective Section 1326 indictments on *Salazar-Lopez* grounds. *See Garcia-Aguilar v. United States District Court for the Southern District of California,* 2008 WL 3009680 (9th Cir. Aug. 6, 2008). In the present case, there was no guideline disincentive from bringing this issue and preserving it for appeal, but this young defendant declined to do so: he wanted to simply admit his guilt and to begin to serve his sentence.

This very early acceptance of responsibility merits a sentence at the low-end of the guideline range. The mid-range sentence urged by the government, or the high-end

---

[1] As will be described in more detail *infra,* the government inexplicably delayed bringing Mr. Magana-Alvarado into federal court for at least eight months – and arguably, for over a year.

[2] The *Salazar-Lopez* defect applies in Magana-Alvarado's case – even with a sentence below twenty-four months – because the three year term of supervised release exceeds the one year term authorized by Section 1326(b).

sentence urged by Probation, sends exactly the wrong institutional message in these types of cases where a defendant's prompt acceptance of responsibility can save considerable judicial and government resources.

Moreover, this young man has a number of mitigating factors that support beginning the departure and Section 3553(a) analysis at the low-end of the guideline range. Although he was born in Mexico, Mr. Magana-Alvarado has lived continuously in the United States since he was two years old. *See PSR* at 9 ¶ 34. He is completely fluent in English, and all of his family ties are in San Mateo. *Id.* The defendant's complete cultural assimilation in the United States means that the sure deportation that will follow this sentence will be particularly difficult. That cultural assimilation is a basis for beginning the departure and variance analysis at the low end of the guideline range – indeed, it is a separate basis for a departure from that low end. *See United States v. Lipman*, 133 F.3d 726, 730 (9th Cir. 1998) ("Because the Sentencing Commission has never addressed or proscribed 'cultural assimilation' per se as a factor that may justify departure, we hold that a sentencing court has authority under U.S.S.G. § 5K2.0 to consider evidence of cultural assimilation. )

Finally, Mr. Magana-Alvarado has suffered a particularly difficult childhood and was given no youthful guidance. His father was alcoholic and physically abusive towards the defendant, his mother, and his siblings. *PSR* at 9 ¶ 34. This violent father hit Magana-Alvarado "all the time. *Id.* In fact, Mr. Magana-Alvarado's father is now serving time in San Quentin for a domestic violence conviction. *Id.*

Each of these mitigating factors in their own right merit a downward departure or variance to the seven month sentence urged by the defense. At minimum, however, these factors certainly warrant beginning the departure and Section 3553(a) variance analysis at the low end of the guideline range: fifteen months.

## II. The Court Should Depart Downwards in Light of Mr. Magana-Alvarado's Lost Opportunity to Serve Concurrent Time

This Court should depart downwards eight months from the low-end of the

guideline range, in light of the lost opportunity of Mr. Magana-Alvarado to serve concurrent time on this conviction and a CYA parole violation.

The presentence report correctly reports that "authorities became aware of the defendant's presence in the United States, subsequent to Magana-Alvarado's arrest on December 9, 2006, in Palo Alto California. *PSR* at 3 ¶ 6. The PSR also reveals that "on May 8, 2007 authorities became aware of Mr. Magana-Alvarado. *Id.*[3]

There is no explanation, however, for the considerable delays before federal prosecution. ICE first became aware of Magana-Alvarado in December 2006, ICE finally got around to interviewing him in May of 2007, the government accepted the case for prosecution on May 14, 2007, and yet the defendant was not brought into federal court until *January 23, 2008* – a delay of over eight months from the ICE interview.

The chronology of this case reveals a significant and inexplicable delay in federal prosecution – a delay that cost the defendant the opportunity to serve concurrent state time for a state CYA parole violation. *See PSR* at ¶ 28 ("6/28/07, paroled, transferred to CYA custody. )

The chronology of the detection and prosecution of Mr. Magana-Alvarado is as follows:

- **December 6, 2006:** San Mateo Detective Decker discovers time-stamped photos of Magana-Alvarado on a MySpace web page;

- **December 9, 2006:** Magana-Alvarado arrested at his parents' home in East Palo Alto;

- **December 13, 2006:** San Mateo Officer Bickel speaks to ICE Special Agent Mike Appio. Appio "said he would look into the case for possible Federal prosecution of Magana for entering the country illegally . . . . *Exh. A, San Mateo Police Department Narrative*, Bates MAG000029.

- **May 8, 2007:** Magana-Alvarado again detected by ICE agents and interviewed

---

[3] Actually, as will be explained below, ICE was made aware of Magana-Alvarado at least as early as December 13, 2006.

at San Quentin State Prison;

• **May 14, 2007 at 10:10 a.m.:** Department of Homeland Security Agent Cecyle Andrews e-mails a referral of Magana-Alvarado's case for Section 1326 prosecution to United States Attorney supervisor Iona Petrou; *See Exh. B, E-mail print-out dated May 15, 2007*, Bates MAG000021;

• **May 14, 2007 at 3:35 p.m.:** AUSA Petrou e-mails Agent Andrews, assuring him that AUSA Erika Frick will handle the case; *Id.*;

• **June 28, 2007:** Magana-Alvarado paroled from San Quentin onto a CYA warrant, and transferred to CYA custody in Chino, California. *PSR* at 8 ¶ 28.

• **June 2007 - January 2008:** Mr. Magana-Alvarado transferred from San Quentin to Chino on the CYA warrant, from Chino to the San Bernardino jail on a Marshal's detainer for the current charges, from San Bernardino to Oklahoma in roughly December 2007 in federal custody, and back to Santa Rita jail in Northern California in the United States Marshal's custody;

• **January 18, 2008:** Magana-Alvarado "transferred into federal custody after completing his CYA parole revocation. *See PSR* at 7 ¶ 27.

Why didn't federal agents bring the defendant to federal court from San Quentin to face the Section 1326 charges after the United States Attorney accepted the case for prosecution on May 14, 2007?[4] They certainly had ample time to do so: forty-five days elapsed between the government's acceptance of the case for prosecution and the defendant's removal to CYA for the parole violation there. The federal government cannot claim that it was unaware of the CYA parole detainer: that fact was reported plainly by the San Mateo police on the very first page of the December 2006 arrest report

---

[4] Besides the lost opportunity to serve concurrent time, the government's failure to simply writ Mr. Magana-Alvarado in from San Quentin had a very real resource and human cost. The young defendant was shuttled to Chino, to San Bernardino, to *Oklahoma*, and then back the Northern California – all in very unpleasant custodial conditions. Thus, instead of a forty-minute trip from Marin to the federal building in May '07, the defendant underwent an eight-month, two-thousand mile odyssey throughout California, to the mid-west, and back again to Northern California.

– a report that was sent to "Mike Appio of ICE. *See Exh. C, San Mateo Incident Report*, ("Magana had a no bail warrant out of CDC and CYA for his arrest. ) Bates MAG000026.

It appears that the origin of this considerable delay was a failure of the United States Attorney's office to procure a writ ad prosequendum for Mr. Magana-Alvarado while he was in custody at San Quentin in May of 2006. That oversight cost the defendant dearly; he lost the opportunity to serve concurrent state parole time with the federal illegal reentry sentence that this Court will impose.

How much concurrent time was lost? Actually, there is a fair argument that the defendant lost the opportunity to serve concurrent time *both* for the state parole violation he served in San Quentin (beginning in December 2006), *and* for the CYA parole violation he served beginning on June 28, 2007.[5]

At minimum, however, the Court should depart downwards to offset the time lost by Mr. Magana-Alvarado from the date of acceptance of prosecution by the United States Attorney's office (May 14, 2007) to the date that he made his first appearance in federal court (January 23, 2008): eight months and nine days. All of that time was spent serving a parole violation in CYA. *See PSR* at 7 ¶ 27, 8 ¶ 28. All of that CYA parole custody time would have been run fully concurrent with the federal Section 1326 sentence had Mr. Magana-Alvarado simply been brought to federal court in May of 2007 from San Quentin – when the government first accepted prosecution.

Deducting eight months of this "lost opportunity  time from the fifteen month, low-end sentence urged by the defense produces an ultimate sentence of seven months.

---

[5] On December 13, 2006, police officer R. Bickel said he talked to Special Agent Mike Appio of ICE, who said, "he would look into the case for a possible Federal prosecution of Magana entering the country illegally. *See Exh. A*, Narrative Report, at Bates MAG000029.

There has been no explanation why it took ICE and Agent Appio from December 13, 2006 until May of 2007 before it finally got around to interviewing Mr. Magana-Alvarado.

As of the sentencing hearing on August 22, 2008, Mr. Magana-Alvarado will have spent seven months and four days in "pure federal custody.[6]

This Court, of course, has ample discretion to depart downwards from the guideline range to offset the lost opportunity to serve concurrent state and federal time. *See United States v. Sanchez-Rodriguez*, 161 F.3d 556 (9th Cir. 1998) (*en banc*). The Court may also vary from the guideline range to offset this lost opportunity, which is commonly provided to other Section 1326 defendants who are prosecuted in a more timely manner. *See* 18 USC § 3553(a)(6) ("the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.")

The Court should accordingly depart downwards or adopt a Section 3553(a) variance, reduce the fifteen-month low-end sentence by eight months, and impose a sentence of seven months of custody for this Section 1326 violation.

### III. The Court Should Vary from the Guideline Sentence in Light of Sentence Discrepancies with Fast-Track Defendants

Mr. Magana-Alvarado's case well-illustrates the inequities between similarly-situated defendants by virtue of the "fast-track" policy of the United States Attorney's office.

As this Court knows, the Sentencing Commission and the United States Attorney's office have adopted a "fast-track" policy that rewards quick entries of pleas in Section 1326 cases. This deal knocks-off four additional offense levels in addition to the three offense levels for acceptance of responsibility. Thus, in the frequent, most-serious cases a Section 1326 defendant can go from Criminal History Category VI Offense Level 21

---

[6] The defendant was apparently transferred into federal custody on January 18, 2008. The PSR states that he was transferred into federal custody on "1/18/07," but that appears to be a typographical error and should be corrected in the final PSR sent to the BOP. *See PSR* at 7 ¶ 27; *compare PSR* at 1 (correctly reporting, "In continuous federal custody since January 18, 2008.")

(post-acceptance) to Category VI Offense Level 17: a savings of 26 months, or 33% of the low-end of the actual guideline range. Moreover, the fast-track deals typically include a low-end recommendation from the government.

Mr. Magana-Alvarado, by contrast, has received no "extra incentive for pleading guilty very early with no pretrial motions, and without setting a trial date. The reason he does not get the benefit of the extra four levels off is because he is *not culpable enough*: at Offense Level 10 his guideline range is not high enough to accommodate the fast-track four offense-level reduction.

Put differently, defendants like Magana-Alvarado do not get fast-track, 33% reductions in their sentences for quick pleas of guilt because they are not have yet accumulated sufficiently bad convictions. Only more culpable defendants are entitled to this sentencing windfall.

There is no logical or rational way to defend a fast-track policy that rewards more-serious defendants with a one-third sentence reduction, but that denies that same benefit to *less* culpable defendants who plead quickly, without motions. This Court should accordingly vary from the guidelines to impose a sentence commiserate with other (more culpable) defendants who receive fast-track offers. *See* 18 USC § 3553(a)(6) ("the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. ) This Section 3553(a) variance from the low-end range of fifteen months is a second basis to impose the below-guideline sentence of seven months urged by the defense.

//
//
//
//
//
//

## Conclusion

For the foregoing reasons, this Court should depart and vary from the low end of the guideline range, fifteen months, and impose a custodial sentence of seven months of custody.

Dated: August 18, 2008

Respectfully submitted,

BARRY J. PORTMAN
Federal Public Defender

/s

STEVEN G. KALAR
Assistant Federal Public Defender